FILED
U.S. DISTRICT COURT
NORTHERN DIST. OF TX
FT. WORTH DIVISION

2013 OCT 28   PM 3: 46

CLERK OF COURT

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | | |
|---|---|---|
| MB FINANCIAL BANK, N.A., | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| | § | |
| v. | § | |
| | § | **CASE NO. 4:13-CV-806-A** |
| THE FEDERAL DEPOSIT | § | |
| INSURANCE CORPORATION | § | |
| ("FDIC") as Receiver for FIRST | § | |
| NATIONAL BANK (EDINBURG), | § | |
| N.A., NAHS REAL ESTATE, L.P., | § | |
| NORTH AMERICAN HOSPITAL | § | |
| SYSTEMS, L.L.C., | § | |
| TEXAS GENERAL HOSPITAL, L.P., | § | |
| SULEMAN F. HASHMI, and | § | |
| DR. HASAN HASHMI, | § | |
| | | |
| **Defendants.** | | |

## PLAINTIFF'S SECOND AMENDED COMPLAINT
## AND APPLICATION FOR WRIT OF SEQUESTRATION

**TO THE HONORABLE COURT:**

Plaintiff MB FINANCIAL BANK, N.A. ("Plaintiff" or "MB") complains in this Second

Amended Complaint and Application for Writ of Sequestration[1] against Defendants The

FEDERAL DEPOSIT INSURANCE CORPORATION ("FDIC") as Receiver for FIRST

NATIONAL BANK (EDINBURG), N.A. ("FNB"), NAHS REAL ESTATE, L.P. ("NAHS"),

NORTH AMERICAN HOSPITAL SYSTEMS, L.L.C., ("North American"), TEXAS

GENERAL HOSPITAL, L.P. ("Texas General"), SULEMAN F. HASHMI ("Mr. Hashmi"), and

DR. HASAN HASHMI ("Dr. Hashmi") (combined herein as "Defendants") and respectfully

---

[1] Although styled as a "Second Amended Complaint", this document is submitted under the Court's Order to re-plead following removal of this matter to Federal Court, and no additional causes of action are asserted beyond the live pleading as it existed in the State Court prior to removal.

shows the Court as follows:

## I. THE PARTIES

1.      Plaintiff is a National Banking Association with its principal place of business at 6111 N. River Road, 7th Floor, Rosemont, Illinois, 60018.

2.      Defendant FNB was a National Banking Association with its principal place of business at 100 W. Cano, Edinburg, Texas 78540.  On September 13, 2013, the office of the Comptroller of the Currency closed FNB and appointed the FDIC as Receiver for FNB such that FNB is now under the control of the FDIC.  The FDIC has appeared in this action and may be served henceforth through its counsel of record in this matter.

3.      Defendant NAHS is a Texas limited partnership with its principal place of business in Texas at 500 North Valley Parkway, Suite 112, Lewisville, Texas, 75067, and NAHS was properly served there or through its registered agent, William W. Meier III at 2001 Bryan St., Suite 3900, Dallas, Texas 75201.  NAHS has appeared in the state court through its attorney of record.

4.      Defendant North American is a Texas limited liability company with its principal place of business at 2709 Hospital Boulevard, Grand Prairie, Tarrant County, Texas 75051. North American was properly served there or through its registered agent, William W. Meier III at 2001 Bryan St., Suite 3900, Dallas, Texas 75201.  North American has appeared in the state court through its attorney of record.

5.      Defendant Texas General is a Texas limited partnership with its principal place of business at 2709 Hospital Boulevard, Grand Prairie, Tarrant County, Texas 75051 and was properly served at that location.  Texas General has appeared in the state court through its attorney of record.

4435221.1

6.     Defendant Suleman F. Hashmi is an individual residing in Texas and was properly served at 2709 Hospital Boulevard, Grand Prairie, Tarrant County, Texas 75051. Suleman Hashmi has appeared in the state court through its attorney of record.

7.     Defendant Dr. Hasan Hashmi is an individual residing in Texas and was served at 2709 Hospital Boulevard, Grand Prairie, Tarrant County, Texas 75051. Dr. Hasan Hashmi has appeared in the state court through its attorney of record.

## II. JURISDICTION AND VENUE

8.     Jurisdiction and venue before this Court appears to be proper pursuant to 12 U.S.C. § 1819(b)(2)(B) and 28 U.S.C. § 1441.

## III. FACTUAL BACKGROUND

9.     Plaintiff is a financial institution which, among other things, finances commercial leases and purchases.

10.     Defendant FNB similarly was a financial institution that provided commercial lending.

11.     In 2007, Renaissance Healthcare Systems, Inc. approached Capital Advance Leasing, Inc. for financing certain HVAC equipment for the Renaissance Hospital – Grand Prairie. For business and credit reasons, Capital Advance Leasing, Inc. would only extend credit for a portion of the HVAC system at the hospital.

12.     On or about December 5, 2007, Capital Advance Leasing, Inc. and Renaissance Healthcare Systems, Inc. entered into that certain Master Lease Agreement 1907 for certain HVAC equipment, which is specifically described in an attachment to Master Lease Agreement 1907 (the "MB Equipment"). The Master Lease Agreement and the attachment are attached

hereto as Exhibit A and incorporated herein by reference.

13.     The MB Equipment was to be used at the Renaissance Hospital in Grand Prairie, Texas (the "Grand Prairie Hospital"). Additionally, Renaissance Hospital – Grand Prairie, Inc. became a co-lessee under Master Lease Agreement 1907.

14.     Defendant FNB and Metrobank, N.A. ("Metro") were secured lenders to Renaissance Healthcare Systems, Inc. and Renaissance Hospital – Grand Prairie, Inc., for, *inter alia*, the Grand Prairie Hospital.

15.     On or about February 19, 2008, Capital Advance Leasing, Inc. entered into an Assignment of its interests in Master Lease Agreement 1907 to MB. Notice of the Assignment was given to Defendants FNB and Metro, who had each previously agreed to subordinate their respective liens in the MB Equipment. MB also prepared and filed with the Texas Secretary of State's office a UCC Financing Statement giving notice of its interest in the MB Equipment.

16.     MB wire transferred funds to Capital Advance Leasing and JMC Mechanical, Inc. in the amount of $1,073,311.50 for payment of all of the MB Equipment.

17.     MB further protected its interests in the MB Equipment by obtaining agreements from FNB and Metrobank that MB had superior interests in the MB Equipment.

18.     Renaissance Healthcare Systems, Inc. and Renaissance Hospital – Grand Prairie, Inc. subsequently defaulted on the terms of Master Lease Agreement 1907, and in August 2008 filed bankruptcy in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division. In the jointly administered bankruptcy cases of Renaissance Healthcare System, Inc. and Renaissance Hospital – Grand Prairie, Inc., the Master Lease Agreement 1907 was rejected by the debtors, Renaissance Health Care System, Inc. and Renaissance Hospital – Grand Prairie, Inc., and the automatic stay was lifted such that MB was authorized to have possession

of the MB Equipment and protect its interests in the MB Equipment, free of the claims of the debtors and outside of the bankruptcy court and the bankruptcy cases.

19.     In the course of the bankruptcy proceedings, FNB and Metro, as secured creditors, also obtained relief from the automatic stay from the bankruptcy court to allow a foreclosure sale of the real and personal property at the Grand Prairie Hospital.

20.     In that process, Metrobank and FNB agreed that MB's interests in the MB Equipment was superior to any interest they had in the MB Equipment.

21.     The foreclosure sale by Metrobank occurred in April 2009.  Metrobank was the successful bidder at the foreclosure.  Metrobank thereafter transferred its interests in the hospital and/or the hospital real estate to FNB by deed.

22.     MB and Metrobank/FNB discussed the removal of the MB Equipment and reached an agreement to allow the MB Equipment to remain onsite, as it would be attractive to a prospective buyer to have the HVAC Equipment available for purchase and therefore benefitted both Metrobank/FNB and MB in their efforts to sell the properties of each.

23.     Subsequently, FNB transferred the real and personal property at the Grand Prairie Hospital to Defendant NAHS and/or North American.  That transfer occurred on or about June 30, 2010.

24.     FNB did not notify MB of the sale at any time.  Therefore, MB was unaware of the sale until June 2012, when it discovered the fact of the sale on its own and brought this lawsuit.

25.     NAHS and/or North American was aware that the property it purchased contained removables and leased equipment that were not transferred or were otherwise subject to competing claims.  Nonetheless, upon information and belief, NAHS and/or North American

undertook no due diligence prior to purchase to review either the documents filed of record in the Renaissance Hospital bankruptcy case or the UCC Financing Statements related to the property.

26.     The sale documents from FNB to NAHS and/or North American expressly stated that FNB did not transfer any interests in leased equipment, such as the MB Equipment.

27.     In addition to MB, York International asserted claims against some HVAC equipment at the Renaissance Hospital that York International had filed liens against..

28.     York International has specifically stated that the equipment it made claim on is different than the MB Equipment.  MB made Defendants aware of this fact before Defendants answered this lawsuit.

29.     York International and NAHS reached a settlement agreement wherein York released the mechanics liens it had filed.

30.     The York mechanics liens did not include the MB Equipment.   This is demonstrated by simply comparing the York liens to the MB Equipment list.

31.     At this point, MB has not determined if the MB Equipment was purportedly included in the sale from FNB to NAHS and/or North American.  It is clear that the MB Equipment was located on the hospital premises prior to, at the time of, and after the sale, and upon information and belief, is in use today by NAHS and/or North American and/or Texas General at the Grand Prairie Hospital.

32.     The value of the MB Equipment is in excess of $1,000,000.00.

33.     Upon information and belief, Mr. Hashmi and Dr. Hashmi are managers of the general partner of NAHS, and/or North American and/or Texas General, and in control of those entities.  Upon information and belief, Mr. Hashmi and Dr. Hashmi have acted in their individual capacity to conceal the nature of the sale to thwart MB's efforts to collect on its obligations and

exercise control over the MB Equipment.

34.    The sale and/or use of the MB Equipment by the Defendants is in violation of MB's rights in the MB Equipment and diminishes the value of MB's interest in the MB Equipment with each passing day.

## V.  CLAIMS AND RELIEF

20.    Plaintiff repeats and re-alleges each and every allegation set forth above.

### Conversion Against FNB

21.    Plaintiff asserts a claim against Defendant FDIC as Receiver for FNB for conversion.  To recover on a claim for conversion, MB must prove: (1) it owned, possessed, or had the right to immediate possession of the MB Equipment; (2) the MB Equipment was personal property; (3) the Defendants wrongfully exercised dominion or control over the MB Equipment; and (4) MB suffered injury.  *See Green Int'l v. Solis*, 951 S.W.2d 384, 391 (Tex. 1997); *United Mobil Networks, L.P. v. Deaton*, 939 S.W.2d 146, 147 (Tex. 1997); *Khorshid, Inc. v. Christian*, 257 S.W.3d 748, 759 (Tex. App.—Dallas 2008, no pet.).

22.    As established in Master Lease Agreement 1907, MB has a first priority interest (either as an owner or secured party) in the MB Equipment, and, thus, had a right to immediate possession.  *See City of Wichita Falls v. ITT Commercial Fin. Corp.*, 827 S.W.2d 6, 9-10 (Tex. App.—Fort Worth 1992), *rev'd in part on other* grounds, 835 S.W.2d 65 (Tex. 1992).

23.    Further, as described by Master Lease Agreement 1907, the MB Equipment was personal property.  Texas courts have held that a security interest is a type of property that can be converted if a party exercises dominion and control over the collateral property.  *See Crutcher v. Continental Nat'l Bank*, 884 S.W.2d 884, 888 (Tex. App.—El Paso 1994, writ denied).

24.    FNB has exercised dominion and control over the MB Equipment (potentially

even including it in the sale to NAHS), which MB Equipment, upon information and belief, is currently in use at the Grand Prairie Hospital. FNB admitted MB had an interest superior to any interest that they held in the MB Equipment and FNB did not advise MB of the sale to NAHS and/or Texas General. Thus, MB can establish the third element of conversion – the defendant wrongfully exercised dominion or control over the MB Equipment.

25.     Finally, FNB's acts have damaged MB in an amount within the jurisdiction of this Court to be proven at trial.

### Declaratory Judgment Against FNB

26.     Additionally, or in the alternative, pursuant to the Federal Declaratory Judgments Act, 28 U.S.C. §§ 2201-2202, and Chapter 37 of the Texas Civil Practice and Remedies Code, MB seeks a declaratory judgment from the Court as to the priority of its interests in the MB Equipment, specifically:

   a.   A determination that MB is the current superior lien holder in, or owner of, all of the MB Equipment, which interests are superior to any interests of Defendants in such MB Equipment;

   b.   A determination that none of Defendants have the lawful right of possession of the MB Equipment;

   c.   A determination that the MB Equipment must be either returned to MB or the value of such equipment paid to MB;

   d.   A finding in favor of MB on all reasonable costs and attorney fees expended in this dispute; and

   e.   For all other findings in favor of MB that the Court finds just and reasonable.

### Conversion Against NAHS, North American, Texas General, Mr. Hashmi, and Dr. Hashmi

27. Additionally, Plaintiff asserts a claim against Defendants NAHS, North American, Texas General, Mr. Hashmi, and Dr. Hashmi for conversion. To recover on a claim for conversion, MB must prove: (1) it owned, possessed, or had the right to immediate possession of the MB Equipment; (2) the MB Equipment was personal property; (3) the Defendants wrongfully exercised dominion or control over the MB Equipment; and (4) MB suffered injury. *See Green Int'l v. Solis*, 951 S.W.2d 384, 391 (Tex. 1997); *United Mobil Networks, L.P. v. Deaton*, 939 S.W.2d 146, 147 (Tex. 1997); *Khorshid, Inc. v. Christian*, 257 S.W.3d 748, 759 (Tex. App.—Dallas 2008, no pet.).

28. As established in Master Lease Agreement 1907, MB has a priority interest in the MB Equipment (either as owner or secured party), and, thus, has a right to immediate possession. *See City of Wichita Falls v. ITT Commercial Fin. Corp.*, 827 S.W.2d 6, 9-10 (Tex. App.—Fort Worth 1992), *rev'd in part on other* grounds, 835 S.W.2d 65 (Tex. 1992).

29. Further, as described by Master Lease Agreement 1907, the MB Equipment was personal property. Texas courts have held that a security interest is a type of property that can be converted if a party exercises dominion and control over the collateral property. *See Crutcher v. Continental Nat'l Bank*, 884 S.W.2d 884, 888 (Tex. App.—El Paso 1994, writ denied).

30. NAHS, North American, Texas General, Mr. Hashmi, and Dr. Hashmi have exercised dominion and control over the MB Equipment, which, upon information and belief, is currently in use at the Grand Prairie Hospital. Thus, MB can establish the third element of conversion – the defendant wrongfully exercised dominion or control over the MB Equipment.

31. Finally, NAHS's, North American's, Texas General's, Mr. Hashmi's, and/or Dr. Hashmi's acts have damaged MB in an amount within the jurisdiction of this Court to be proven

at trial.

<u>**Declaratory Judgment Against NAHS, North American**</u>
<u>**Texas General, Mr. Hashmi, and Dr. Hashmi**</u>

32.     Additionally or in the alternative, pursuant to Chapter 37 of the Texas Civil

Practice and Remedies Code, MB seeks a declaratory judgment from the Court as to the priority

of its interests in the MB Equipment, specifically:

a.  A determination that MB is the current superior lien holder in, or owner of, all of the

MB Equipment, which interests are superior of any interests of Defendants in such

MB Equipment;

b.  A determination that none of Defendants have the lawful right of possession of the

MB Equipment;

c.  A determination that the MB Equipment must be either returned to MB or the value

of such equipment paid to MB;

d.  A finding in favor of MB on all reasonable costs and attorney fees expended in this

dispute; and

e.  For all other findings in favor of MB that the Court finds just and reasonable.

**VI.  APPLICATION FOR WRIT OF SEQUESTRATION**

33.     The MB Equipment items in Exhibit A are mechanical HVAC items which are

currently in use by Defendants and said use is causing a diminishing value to those items with

each passing day.  The largest and most valuable single items are three Bryan Hot Water Heaters,

Serial Numbers 95677, 95676 and 95675 and three York Centrifugal Chillers, Serial Numbers

GPR-046, GPR-043 and GPR-044.

34.     On or about August 22, 2012, an inspection was done onsite at the Grand Prairie

Hospital in Tarrant County, Texas, which revealed that the items hot water heaters and chillers

were in place and being used on a daily basis by Defendant NAHS. Id. at ¶ 11.

35.    Pursuant to Tex. R. Civ. P. 696 et al., MB requests that the Court issue a writ of sequestration to immediately cease operation and use of the hot water heaters and chillers so that the daily wear and tear does not further diminish the value of the equipment. MB does not have the current value of the hot water heaters or chillers.

36.    MB is ready to post an adequate bond pursuant to Tex. R. Civ. P. 698.

### VII.  ATTORNEYS' FEES, COSTS, AND OTHER RELIEF

37.    Pursuant to applicable Texas law, Plaintiff hereby sues Defendant for reasonable and necessary attorneys' fees and costs. *See* TEX. CIV. PRAC. & REM. CODE §§ 37.001 *et seq.* and 38.001 *et seq.*

### VIII.  CONDITIONS PRECEDENT

38.    All conditions precedent to Plaintiff filing this action and recovering from Defendants have been met or have been waived.

### IX.  JURY DEMAND AND PRAYER

39.    As is its right under the constitutions and laws of the United States and this State, Plaintiff hereby respectfully requests a trial by jury.

### X.  PRAYER FOR RELIEF REQUESTED

WHEREFORE, Plaintiff MB Financial Bank, N.A. respectfully prays that the Court issue a writ of sequestration and that Defendants First National Bank, N.A., NAHS Real Estate, L.P., North American Hospital Systems, L.L.C., Texas General Hospital, L.P., Suleman F. Hashmi, and Dr. Hasan Hashmi be cited to appear and answer herein, and upon final hearing that Plaintiff MB Financial Bank, N.A. have judgment against the Defendants for the following:

a.    actual damages;

b. consequential, special, and incidental damages;

c. A declaratory judgment from the Court as to its interests in the MB Equipment listed in Master Lease Agreement 1907, specifically:

    1. A determination that MB is the current superior lien holder in, or owner of, all of the MB Equipment which interests are superior to any interests of Defendants in such MB Equipment;

    2. A determination that none of Defendants have the lawful right of possession of the MB Equipment; and

    3. A determination that the MB Equipment must be either returned to MB or the value of such equipment paid to MB;

d. entry of a writ of sequestration;

e. attorneys' fees;

f. costs of court;

g. prejudgment interest;

h. post-judgment interest from the date of judgment until paid;

i. general relief; and/or

j. any other or further relief to which Plaintiff might be entitled.

Respectfully submitted,

Cody L. Towns
State or Texas bar No. 24034713

**RODRIGUEZ LAW FIRM, P.C.**
1700 Pacific Avenue, Suite 3850
Dallas, Texas 75201
Telephone: (214) 220-2929
Facsimile: (214) 220-2920

and

Patrick Huffstickler
State Bar No. 10199250
Teresa Giltner
State Bar No. 06639800
Aubrey Colvard
State Bar No. 24076324

**COX SMITH MATTHEWS
INCORPORATED**
1201 Elm Street, Suite 3300
Dallas, Texas 75270
(214) 698-7800
(214) 698-7899 (FAX)

**ATTORNEYS FOR PLAINTIFF
MB FINANCIAL BANK, N.A.**

## CERTIFICATE OF SERVICE

I hereby certify that on October 28, 2013, a true and correct copy of the foregoing document was served via facsimile on the counsel of record listed below:

Boyd Mouse
Kane Russell Coleman & Logan, P.C.
1601 Elm Street, #3700
Dallas, Texas 75201
(214) 777-4200
Fax: (214) 777-4299
Email: bmouse@krcl.com

Brian W. Erikson
Quilling, Selander, Lownds, Winslett & Moser, P.C.
2001 Bryan Street, Suite 1800
Dallas, Texas 75201
Fax: (214) 871-2111
Email: berikson@qslwm.com

Deborah E. Lewis
Jamie Seaberry
White & Wiggins, LLP
901 Main Street, Suite 6200
Dallas, Texas 75202
(214) 665-4150
Fax: (214) 665-4160
Email: dlewis@whitewiggins.com

Cody L. Towns



### MASTER LEASE AGREEMENT NO. 1907

Dated as of: December 6, 2007

LESSOR: Capital Advance Leasing, Inc. (herein called "LESSOR")
ADDRESS: 435 East 17th Street, Ste. 390
Costa Mesa, CA 92627

LESSEE: Renaissance Healthcare Systems, Inc. (herein called "LESSEE")
ADDRESS: 14440 JFK Blvd., Houston, TX 77032

1. LEASE. LESSOR hereby leases and/or grants to LESSEE the right to use, and LESSEE hereby leases from and/or agrees to accept the right to use, subject to the terms and conditions herein set forth, the item(s) of personal property including but not limited to hardware and/or software and herein referred to as "Equipment" described in each Equipment Schedule entered into from time to time pursuant to this Master Lease Agreement. Each Equipment Schedule entered into by the parties shall constitute a separate non-cancelable lease agreement and shall incorporate therein all of the terms and conditions of this Master Lease Agreement and contain such additional terms and conditions as agreed upon. The term "LEASE" as used hereinafter shall refer to an individual Equipment Schedule which incorporates this Master Lease Agreement. Until an Equipment Schedule is signed by LESSOR, an Equipment Schedule signed by LESSEE constitutes an irrevocable offer by LESSEE to lease from LESSOR.

2. TERM. This Master Lease Agreement shall be effective when signed by both parties and shall continue in effect until all obligations of LESSEE under each Equipment Schedule are fully satisfied. The Lease Term for each Equipment Schedule shall become effective on the first day of the calendar quarter (calendar quarter is defined as the 1st of the months of January, April, July and October) following the Installation Date ("Commencement Date"). The Installation Date is the (i) date on which the Equipment is installed at the location set forth in the Equipment Schedule ("Equipment Location") and declared acceptable by LESSEE; or (ii) if the Equipment is already installed, being used and leased from another party and is being purchased by LESSOR for lease to LESSEE hereunder, then the date on which LESSOR pays for the Equipment. LESSEE shall promptly sign and deliver to LESSOR a Certificate of Acceptance dated as of the Installation Date. Unless LESSEE, not less than ninety (90) days prior to the initial or extended expiration of the LEASE, notifies LESSOR in writing by certified mail of its intention not to extend the LEASE, the LEASE shall automatically and continuously be extended on the same terms and conditions for a period of three (3) months.

3. RENT. LESSEE shall pay to LESSOR at its address set forth above, or at such other address LESSOR may hereinafter designate in writing, the rent specified for the Equipment, payable in advance, effective on the Commencement Date. Charges from the Installation Date to the Commencement Date shall be computed by converting the monthly or other calendar period rental to a daily rate based on a 30-day month. Subsequent monthly or other calendar period rental payments shall be due on the same day of subsequent months or other calendar periods as the Commencement Date of the LEASE.

4. DISCLAIMER OF WARRANTIES. (a) LESSEE ACKNOWLEDGES THAT LESSEE MADE THE SELECTION OF THE EQUIPMENT BASED ON ITS OWN JUDGMENT AND IS NOT RELYING ON LESSOR'S SKILL OR JUDGMENT TO SELECT OR FURNISH GOODS SUITABLE FOR ANY PARTICULAR PURPOSE. LESSEE ACKNOWLEDGES THAT LESSOR HAS NOT MADE AND DOES NOT MAKE ANY WARRANTIES, EXPRESS OR IMPLIED, DIRECTLY OR INDIRECTLY, INCLUDING, WITHOUT LIMITATION THE WARRANTY OF MERCHANTABILITY AND OF FITNESS, CAPACITY OR DURABILITY FOR ANY PARTICULAR PURPOSE, AND WARRANTIES AS TO THE DESIGN OR CONDITION OF THE EQUIPMENT AND THE QUALITY OF THE MATERIAL OR WORKMANSHIP OF THE EQUIPMENT. LESSOR SHALL HAVE NO LIABILITY TO LESSEE FOR ANY CLAIM, LOSS OR DAMAGE OF ANY KIND OR NATURE WHATSOEVER, INCLUDING ANY SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, TO ANY EXTENT WHATSOEVER, RELATING TO OR ARISING OUT OF THE SELECTION, QUALITY, CONDITION, MERCHANTABILITY, SUITABILITY, FITNESS, OPERATION OR PERFORMANCE OF THE EQUIPMENT, NO DEFECT IN OR UNFITNESS OF THE EQUIPMENT SHALL RELIEVE LESSEE OF ITS OBLIGATIONS UNDER THE LEASE. LESSEE agrees that LESSOR assumes no liability for and makes no representation as to the treatment by LESSEE of the LEASE, the Equipment or the rent payments or other sums due thereunder for financial statement or tax purposes.

(b) For the term of the LEASE, or any extension thereof, LESSOR hereby assigns to LESSEE and LESSEE may have the benefit of any and all Vendor's warranties, service agreements and patent indemnities, if any, with respect to the Equipment to the extent assignable by LESSOR, provided, however, that LESSEE's sole remedy for the breach of any such warranty or indemnification shall be against the Vendor and not against LESSOR, nor shall any such breach have any effect whatsoever on the rights and obligations of either party with respect to the LEASE.

5. STATUTORY FINANCE LEASE. LESSEE agrees and acknowledges that it is the intent of both parties to the LEASE that it qualify as a statutory finance lease under Article 2A of the Uniform Commercial Code. LESSEE acknowledges and agrees the LESSEE has selected both (1) the Equipment, and (2) the Vendor from whom the Equipment is to be acquired. LESSEE acknowledges the LESSOR has not participated in any way in LESSEE's selection of the Equipment or of the Vendor and LESSOR has not selected, manufactured, or supplied the Equipment. Notwithstanding the foregoing, LESSEE hereby grants to LESSOR a security interest in and to the EQUIPMENT, as security for all LESSEE's obligations to LESSOR and authorizes LESSOR to file any financing statements necessary to perfect such interest in accordance with Section 14.

LESSEE IS ADVISED THAT IT MAY HAVE RIGHTS UNDER THE CONTRACT EVIDENCING THE ACQUISITION OF THE EQUIPMENT FROM THE VENDOR CHOSEN BY LESSEE AND THAT LESSEE SHOULD CONTACT THE VENDOR OF THE EQUIPMENT FOR A DESCRIPTION OF ANY SUCH RIGHTS.

6. EQUIPMENT AND LIABILITY. LESSOR, at the request of LESSEE, may order the Equipment described in each Equipment Schedule attached hereto from a Vendor selected by LESSEE. LESSOR shall not be liable for specific performance of the LEASE or for damages if, for any reason, the Vendor fails to accept such order or delays or fails to fill the order. LESSEE agrees to accept such Equipment and authorizes LESSOR to add the serial number of the Equipment to the LEASE.

7. VENDOR NOT AN AGENT. LESSEE understands and agrees that neither the Vendor, nor any salesman or other agent of the Vendor, is an agent of LESSOR, no salesman or agent of the Vendor is authorized to waive or alter any term or condition of the LEASE, and no representation as to Equipment or any other matter by the Vendor shall in any way effect LESSEE's duty to pay the rent and perform its other obligations as set forth in the LEASE.

8. PLACE OF USE. Lessee shall keep the Equipment at its place of business as specified in the LEASE, or at such other place as LESSOR may consent to in writing. LESSEE covenants and agrees not to rent or sublet the Equipment or any part thereof AND WILL NOT WITHOUT LESSOR'S PRIOR WRITTEN CONSENT ASSIGN THE LEASE OR ITS INTEREST THEREUNDER.

9. USE AND RETURN OF EQUIPMENT. LESSEE shall, at its sole expense, maintain the Equipment in good repair, appearance and functional order and in compliance with any manufacturer's and regulatory maintenance and performance standards, keep complete records and documents regarding its use, maintenance and repair, shall not use or permit the use of the Equipment in any unintended, injurious or unlawful manner, shall not permit use or operation of the Equipment by any one other than Lessee's qualified employees and shall not change or alter the Equipment without LESSOR'S written consent. Upon the expiration or termination of the LEASE, unless LESSEE shall exercise any purchase or renewal option granted in connection with any Equipment Schedule, LESSEE at its sole expense shall forthwith have the Equipment de-installed and properly prepared for shipment by the Maintenance Provider (if applicable), insure warranty eligibility for continued maintenance provider's best standard and most current version full service and maintenance agreement (if applicable) and return the Equipment unencumbered to LESSOR, at such place designated by LESSOR, in the same condition as when received by LESSEE, ordinary wear and tear accepted. LESSOR reserves the right to approve or designate the carrier and the means of shipment. All replacement parts, additions and accessories incorporated in or affixed to the Equipment, including but not limited to wiring, software and operating systems, at or after the commencement of the LEASE shall become the property of LESSOR. All related documentation manuals and service logs are the property of LESSOR and are to be returned with the Equipment.

EXHIBIT

A

page 2 of 4

10. RISK OF LOSS AND DAMAGE. (a) LESSEE hereby assumes and shall bear the entire risk of loss or theft, damage, destruction or governmental taking, and from any and every cause whatsoever to the Equipment, whether partial or complete and whether or not through any default or neglect of LESSEE. Except as provided herein, no such event shall relieve LESSEE of its obligation to pay rent hereunder, nor shall any such event impair any other obligation of LESSEE under the LEASE which shall continue in full force and effect.

(b) If any Equipment is damaged, LESSEE must promptly notify LESSOR and within sixty (60) days of such damage shall, at its expense, cause such repairs to be made as are necessary to return the Equipment to its previous condition. LESSEE shall then be entitled to receive from LESSOR any insurance proceeds received in connection with such damage.

(c) In the event that any Equipment is destroyed, damaged beyond repair, lost, stolen or taken by governmental action for a period extending beyond the term of the LEASE, or any extension thereof (an "Event of Loss"), LESSEE must promptly notify LESSOR and pay to LESSOR on the next rental payment date following the Event of Loss, an amount equal to (a) the Stipulated Loss Value set forth in the applicable table (the form of which is attached to each Equipment Schedule as Exhibit B) of the Equipment, if applicable, or (b) an amount equal to the then unpaid balance of the rent due for such Equipment during the term of the LEASE, plus an amount equal to the anticipated residual of the Equipment as of the expiration of the LEASE, or any amount thereof, all discounted to present value at an annual rate of six (6) percent to the date of payment to LESSOR. Upon payment of such amounts, LESSEE's obligation to pay further rent will cease with respect to such Equipment and LESSEE will be entitled to receive any insurance proceeds or other recovery received by LESSOR in connection with such Event of Loss.

11. INSURANCE. LESSEE, at its expense, shall maintain in force, at all times from shipment of the Equipment to LESSEE until surrender thereof, property damage insurance and liability insurance with such coverage and from such insurance carriers as shall be satisfactory to LESSOR. The Equipment must be insured against all risks which are customarily insured against on this type of Equipment leased hereunder and in such amounts as LESSOR reasonably requires but in no event less than the full replacement value of the Equipment. The amount of LESSEE's liability insurance shall be in the amount of at least one million dollars combined single limit, or such greater amount as LESSOR shall reasonably require. LESSEE may act as a self-insurer in amounts acceptable to LESSOR only upon written consent of LESSOR. Insurance policies must name LESSOR and any assignee as an additional insured and loss payee, and provide for thirty (30) days advance written notice to LESSOR of modifications or cancellation. LESSEE shall, upon request, deliver to LESSOR satisfactory evidence of the insurance coverage. In the event LESSEE fails to do so, LESSOR may, at LESSOR's option, in addition to any other rights available to LESSOR, obtain coverage, and any sum paid therefore by LESSOR (including any charges assessed by LESSOR for such service) shall be immediately due and payable to LESSEE by LESSEE.

12. TAXES. (a) The LESSEE shall pay all taxes and assessments (and interest and penalties, if any thereon) which may be levied, directly or indirectly, against the Equipment or any interest therein or with respect to the ownership, possession or use thereof, whether such taxes are levied against the LESSOR or the LESSEE. Such taxes to be paid by the LESSEE shall include, without limitation, property, sales, rent, lease, ad valorem and use taxes and any other tax measured by the gross rent payable hereunder, but shall not include net income or franchise taxes payable by the LESSOR. If such taxes are levied against the LESSOR, it shall notify the LESSEE of such fact. The LESSOR shall have the right, but not the obligation, to pay any such taxes, whether levied against the LESSOR or LESSEE. In such event the LESSEE shall reimburse the LESSOR therefor within twenty days after the receipt of an invoice based on the full amount of such taxes without regard to any discounts LESSOR may obtain due to early payment or otherwise. In the event of failure to make such reimbursement when due, the LESSOR shall have all remedies provided herein with respect to the nonpayment of the rental hereunder. LESSEE agrees to reimburse LESSOR for reasonable costs incurred by LESSOR in collecting taxes and assessments hereunder.

(b) LESSOR reserves the right to invoice and collect an estimated amount for personal property taxes each year, such estimate to be based on the most recent ascertainable assessment. Upon receipt of an invoice for the actual amount due, LESSOR will invoice LESSEE and LESSEE will pay to LESSOR or LESSOR will rebate to LESSEE any difference between the actual invoice and the estimated amount.

13. TITLE. (a) All Equipment shall remain personal property and the title thereto shall remain in the LESSOR exclusively unless the Equipment is, or includes software in which event and only to the extent required by the applicable license, title to said software shall remain in the Licensor. To the extent that this LEASE allows title to software to pass to the Licensee, such title shall vest and remain in LESSOR. To the extent that such vesting requires a specific written conveyance, LESSEE hereby conveys to LESSOR any title it has or may hereafter acquire in the software and relinquishes any subsequent claim or title in the software, including any rights to purchase the software and/or retain rights to use the same beyond the Lease Term. If any provision of the paragraph requires (or for effectiveness Licensor's prior written consent because the License limits transfers, encumbrance, or assignment of the software, then LESSEE shall assist LESSOR, if so requested, in obtaining such consent. LESSEE shall keep the LESSOR's title rights in the Equipment free from any and all liens, claims, and legal processes. LESSEE shall give LESSOR immediate notice of any attachment or other judicial process, lien, or claims affecting the Equipment and shall indemnify and save LESSOR harmless from any loss or damage caused thereby.

(b) In the event the Maintenance Provider deems it necessary to replace any Equipment with like equipment LESSEE shall immediately notify LESSOR of the same. LESSEE further agrees (a) to take all necessary and reasonable steps to insure title to the replacement Equipment is, subject to LESSOR's satisfaction, transferred to the LESSOR, (b) agrees to insure the replacement Equipment as provided in paragraph 11, and (c) to pay any and all costs in connection with or related to such Equipment exchange.

14. FILING. LESSEE, on behalf of LESSEE and LESSOR, hereby authorizes LESSOR and appoints LESSOR its attorney-in-fact to execute and file any financing statements or security agreements with respect to the Equipment or any collateral provided by LESSEE to LESSOR prior to or following LESSOR's acceptance of the Lease, in any state of the United States. LESSEE shall execute such supplemental instruments and financing statements if LESSOR deems such to be necessary or advisable and shall otherwise cooperate to defend the title of the LESSOR by filing or otherwise.

15. RIGHT OF INSPECTION. The LESSOR, its agents, dealers, and representatives shall have the right at any time during usual business hours upon twenty-four (24) hours prior notice to LESSEE, inspect the Equipment and for this purpose to have access to the location of the Equipment.

16. NON-WAIVER. LESSOR's failure at any time to require strict performance by LESSEE of any of the provisions of the Lease shall not waive or diminish LESSOR's right thereafter to demand strict compliance therewith or with any other provision. Waiver of any default shall not waive any other default. LESSOR's rights under the LEASE are cumulative and not alternative.

17. DEFAULT. (a) Time is of the essence of the LEASE, and no waiver by LESSOR of any breach or default shall constitute a waiver of any other breach or default by LESSEE or waiver of any of LESSOR's rights. If LESSEE fails to pay any rent or other amounts required within ten (10) days after the same is due and payable, or if LESSEE fails to observe, keep or perform any other provision of the LEASE required to be observed, kept or performed by LESSEE, or if LESSEE ceases doing business as a going concern, or if a petition is filed by or against LESSEE under the Bankruptcy Act or any amendment thereto (including a petition for re-organization or in arrangement) or if a receiver is appointed for LESSEE or its property, or if LESSEE commits an act of bankruptcy, becomes insolvent, makes an assignment for the benefit of creditors, or if LESSEE defaults under any agreement between LESSEE and LESSOR or between LESSEE and any affiliate of LESSOR, or if LESSEE incurs a material adverse change to its financial condition or ability to perform under this Lease, or if LESSEE without LESSOR's prior written consent, attempts to remove or sell or transfer or encumber or sublet or part with the possession of the Equipment, LESSOR, or its agents shall have the right to exercise any one or more of the following remedies: (a) to declare the entire amount of rent hereunder immediately due and payable without notice or demand to LESSEE, (b) to sue for and recover from the LESSEE the amount stated in the Stipulated Loss Value as set forth in the applicable table (the form of which is attached to the Equipment Schedule as Exhibit B), if any, or an amount equal to the unpaid balance of the rent due and to become due during the term of the LEASE plus an amount equal to the anticipated residual of the Equipment as of the expiration of the LEASE, or any residual thereof, all discounted to present value at an annual rate of six (6) percent to the date of payment to LESSOR, (c) to take possession of any Equipment without demand or notice wherever same may be located without any court order or other process of law. Upon retaking possession of any Equipment, the LESSOR at its option may (i) lease repossessed Equipment or any part thereof to any third party on such terms and conditions as the LESSOR and the Equipment or any part thereof to the highest bidder at public auction or at private sale, and will credit the net amount so realized less expenses incurred in connection with such disposition to the amount due pursuant to (b) above. LESSEE hereby waives any and all damages occasioned by such taking of possession.

page 3 of 4

(b) Any said taking of possession shall not constitute termination of the LEASE and shall not relieve LESSEE of its original obligations unless LESSOR expressly so notifies LESSEE in writing.

(c) To the extent permitted by applicable law, the LESSEE waives any and all rights and remedies conferred upon a LESSEE by UCC Sections 2A-508 through 2A-522, including (without limitation) the LESSEE'S right to (a) cancel or repudiate the LEASE, (b) reject or revoke acceptance of the leased Equipment, (c) recover damages from the LESSOR for breach of warranty or for any other reason, (d) claim a security interest in any rejected Equipment in the LESSEE'S possession or control, (e) deduct from rental payments all or any part of any claimed damages resulting from the LESSOR'S default under the LEASE, (f) accept partial delivery of the leased Equipment, (g) "cover" by making any purchase or lease of other equipment in substitution for Equipment due from the LESSOR, (h) recover from the LESSOR any general, special, incidental or consequential damages, for any reason whatsoever, and (i) specific performance, replevin or the like for any of the leased Equipment.

(d) To the extent permitted by applicable law, the LESSEE waives any rights now or hereafter conferred by statute or otherwise that may require the LESSOR to sell, release or otherwise use or dispose of any of the leased Equipment in mitigation of the LESSOR'S damages as set forth in the LEASE or that may otherwise limit or modify any of LESSOR'S rights or remedies under the LEASE. The remedies provided for in the LEASE shall not be deemed exclusive but shall be cumulative, and shall be in addition to all other remedies existing at law or in equity.

(e) Should any legal proceedings be instituted by LESSOR to recover any monies due or to become due under the LEASE and/or for the possession of the Equipment, LESSEE shall pay LESSOR'S reasonable attorney's fees, court costs, and other related expenses as well as fees and costs incurred in connection with a bankruptcy proceeding including, but not limited to any objections or disputes.

18. ASSIGNMENT. NEITHER THE LEASE NOR THE RIGHTS THEREUNDER SHALL BE ASSIGNED BY LESSEE, NOR SHALL ANY OF THE EQUIPMENT BE SUBLEASED BY LESSEE WITHOUT PRIOR WRITTEN CONSENT OF LESSOR. LESSEE, WITHOUT NOTICE TO LESSEE, MAY AT ANY TIME ASSIGN ALL OR PART OF ITS RIGHT, TITLE AND INTEREST IN AND TO THE LEASE IN AND TO EACH ITEM OF EQUIPMENT AND MONIES TO BECOME DUE TO THE LESSOR THEREUNDER; and LESSOR may grant security interest in the Equipment, subject to the LESSEE'S rights therein as set forth in the LEASE. Any assignee of LESSOR shall have all of the rights, but none of the obligations, of LESSOR under the LEASE and LESSEE agrees that it will not assert against any assignee of LESSOR any defense, counterclaim or offset that LESSEE may have against LESSOR. LESSEE acknowledges that any assignment or transfer by LESSOR would neither materially change LESSEE'S duties or obligations under the LEASE nor materially increase the burdens or risks imposed on LESSEE.

19. POSSESSION AND QUIET ENJOYMENT. LESSOR covenants to and with LESSEE that, provided LESSEE performs the conditions of the LEASE and so long as LESSEE shall not be in default thereunder, LESSEE shall peaceably and quietly hold and use the equipment during the LEASE term without hindrance or interruption by LESSOR.

20. LIABILITY AND INDEMNITY. (a) LESSEE agrees to indemnify LESSOR against and hold LESSOR harmless from any and all claims, (INCLUDING WITHOUT LIMITATION, CLAIMS INVOLVING STRICT OR ABSOLUTE LIABILITY), actions, suits, proceedings, costs, expenses, damages and liabilities at law or in equity, including costs and reasonable attorney's fees, arising out of, connected with or resulting from the LEASE or the Equipment, including, without limitation the manufacture, selection, purchase, ownership, delivery, possession, use, operation, condition, sales, return, storage or disposition thereof, any latent or other defects, whether or not discoverable, and any claim for patent, trademark or trade name infringement.

(b) LESSOR shall not be liable to LESSEE for any loss, damage, injury, or expense of any kind or nature, caused directly or indirectly by any Equipment for the use or maintenance thereof; the repair, servicing or adjustment thereto, or for any delay or failure to provide any thereof, any interruption of service or loss of use of the Equipment, or for any loss of business or damage whatsoever and howsoever caused.

(c) For purposes of this Paragraph, the term "LESSOR" shall include LESSOR, its successors and assigns, shareholders, directors, officers, representatives, employees, and agents, and the provisions of this Paragraph shall survive expiration of the LEASE with respect to events occurring prior thereto.

21. NET LEASE. The LEASE is a net lease and LESSEE agrees that its obligation to pay all rent and other sums payable thereunder are absolute and unconditional and shall not be subject to any abatement, reduction, setoff, defense, counterclaim or recoupment for any reason whatsoever.

22. REPRESENTATIONS AND WARRANTIES OF LESSEE. Lessee hereby represents, warrants and covenants that, with respect to the LEASE, any amendment, addendum, rider, or other attachment executed thereunder;

The execution, delivery and performance thereof by LESSEE has been duly authorized by all necessary corporate or business action.
The individual executing such was duly authorized to do so.
They constitute legal, valid and binding agreements of LESSEE enforceable in accordance with their respective terms.
Any and all financial statements or other information with respect to the LESSEE supplied to LESSOR at the time of execution hereof and any amendments, addenda, or riders hereto are true and complete.

The foregoing representations and warranties shall survive the signing and delivery of the LEASE and any amendment's, riders or other attachments thereto.

23. MISCELLANEOUS. (a) All notices relating hereto shall be in writing and mailed to LESSOR or LESSEE by certified mail, return receipt requested at its respective address above shown or at any later address last known to the sender. The LEASE is irrevocable for the full term thereof and for the aggregate rental therein reserved, and the rent shall not abate by reason of termination of LESSEE'S right of possession and/or the taking of possession by LESSOR or for any other reason. If more than one LESSEE is named in the LEASE, the liability of each shall be joint and several.

(b) Delinquent installments of rent, or other amounts due under the LEASE, of more than ten (10) days shall be subject to a penalty equal to five (5) percent of such payment. If LESSOR supplies LESSEE with labels stating that Equipment is owned by LESSOR, LESSEE shall label the Equipment and shall keep the same affixed in a prominent place.

(c) LESSEE agrees to furnish to LESSOR upon request:
(1) Such additional information as LESSOR may reasonably request concerning LESSEE and LESSEE'S use of the Equipment in order to enable LESSOR to determine whether the covenants, terms, and provisions of the LEASE have been complied with by LESSEE.
(2) Copies of annual or quarterly financial statements, including a copy of the Balance Sheet and Profit and Loss Statement of LESSEE.
(3) Financial Statements of any corporation that owns a controlling interest in LESSEE.
(4) Copies of all Maintenance Provider's reports covering the Equipment, if applicable.
(5) A duly executed written warranty verifying the serial number(s) of the Equipment and any attachments or appurtenances thereto, specifying the shipment date for the return of the Equipment, its general condition, that the Equipment has been and continues to be in use for its intended purpose and within the limitations set forth and at the location(s) specified in the LEASE and that insurance is in full force and effect.

(d) LESSEE agrees to execute and deliver such documents, and to perform such further acts, as may be reasonably requested by LESSOR in order to carry out and effectuate the purposes of the Lease.

(e) LESSEE shall furnish to LESSOR such information and data as LESSOR may from time to time reasonably request as to existence of and status of any claims for damages (whether against the Equipment or against LESSOR or LESSEE) arising out of the use operation or condition of the Equipment; the status of the nature provided to be paid by LESSEE under the provisions of Paragraph 12 which have been assessed and the amount of such taxes paid, and such other data pertinent to the Equipment and the condition, use and operation thereof as LESSOR may from time to time reasonably request.

page 4 of 4

(f) If LESSEE shall fail to comply with its covenants and obligations under the LEASE, the payment of taxes, assessments, and other charges of keeping the Equipment in repair and free of liens, charges, and encumbrances, LESSOR may after reasonable notice to LESSEE of LESSOR'S intent, pay such charges, taxes assessments or cause compliance with such covenants, however, LESSOR shall not be obligated to make advances to perform the same, and all sums so advanced shall be payable to LESSOR upon demand as additional rent. No such advance shall be deemed to relieve LESSEE from any default under the LEASE or be considered a waiver by LESSOR of any of its rights or remedies.

(g) In the event a major change in the ownership or financial condition of LESSEE occurs prior to delivery and acceptance of any Equipment, and LESSOR in its sole discretion deems itself insecure as a result of such change, LESSOR reserves the right to cancel the LEASE and LESSEE hereby agrees to hold LESSOR harmless and to indemnify LESSOR from any and all obligations, liabilities, costs and expenses incurred as a result of such cancellation, including but not limited to LESSOR'S issuance of its purchase order to the Equipment Vendor.

(h) The LEASE, any amendments, addenda, riders, or other attachments made hereto shall be deemed to have been made and executed in Orange County, California, regardless of the order in which the signatures of the parties shall be affixed thereto, and shall be interpreted and the rights and liabilities of the parties therein determined in accordance with the applicable laws of the State of California. LESSOR and LESSEE agree that jurisdiction and venue in any action or proceeding concerning this LEASE shall be in the proper state or federal court located in Orange County, California, unless LESSOR or its assignee selects an alternative forum. LESSOR AND LESSEE EACH IRREVOCABLY WAIVE ALL RIGHTS TO A TRIAL BY JURY IN ANY LITIGATION ARISING FROM OR RELATING TO THIS LEASE.

(i) Unless specified otherwise in the Equipment Schedule, deposits collected in advance shall be applied to Lessor's cost for each LEASE. LESSEE agrees to reimburse LESSOR for LESSOR'S reasonable cost of processing, documentation, filing and search fees, credit reports and other related administrative and processing expenses for each LEASE in excess of the deposits collected.

(j) Notwithstanding anything to the contrary contained in the LEASE, including but not limited to paragraph 17, in addition to all other remedies provided herein, in the event LESSEE fails to ship the Equipment to the destination designated by LESSOR on or before the warranted date as specified in paragraph 23 (c) (5), LESSEE agrees to pay to LESSOR upon demand an amount equal to the daily rate, based on a 30 day month, of the monthly or other calendar period rental for each day after such date until such time as the Equipment leaves the LESSEE'S location.

24. SEVERABILITY. If any provisions of the LEASE or any remedy thereunder provided for is deemed invalid under any applicable law, such provision shall be inapplicable and deemed omitted, but the remaining provisions thereof including remaining default remedies, shall be given effect in accordance with the manifest intent thereof.

25. CONFLICTS. If any of the provisions of the LEASE conflict with any other provisions of any other documentation relating to the transaction, the terms of the LEASE shall prevail and control, unless otherwise agreed to in writing by LESSOR.

26. ENTIRE AGREEMENT, WAIVER. This instrument constitutes the entire agreement between the parties. No waiver by LESSOR of any provision hereof shall constitute a waiver of any other matter. This Master Lease Agreement may be executed simultaneously in any number of counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Master Lease Agreement including any amendments, additions, riders or other attachments is not valid and binding until execution thereof by an authorized officer of LESSOR in Costa Mesa, California.

LESSEE'S INITIALS: [_____]

IN WITNESS WHEREOF, LESSEE and LESSOR have signed this Master Lease Agreement as of the date set forth above.

LESSEE: Renaissance Healthcare Systems, Inc.

BY: _____

NAME: Michael Smiesny

TITLE: Chief Financial Officer

LESSOR: Capital Advance Leasing, Inc.

BY: _____

NAME: Christopher Szopa

TITLE: Executive Vice President

Certified True
and Correct Copy

Signature _____

EQUIPMENT SCHEDULE NO. 002
TO
MASTER LEASE AGREEMENT NO. 1907 DATED AS OF December 05, 2007
Between Renaissance Healthcare Systems, Inc. ("LESSEE") and Capital Advance Leasing, Inc. ("LESSOR")

This Equipment Schedule is entered into in accordance with the Master Lease Agreement identified above. All the terms and conditions of the Master Lease Agreement are hereby incorporated herein and made a part hereof as if such terms and conditions were set forth in this Equipment Schedule. If any of the terms hereof are inconsistent with the terms of the Master Lease Agreement, the terms hereof shall prevail. LESSOR maintains the first right of refusal regarding any upgrades, attachments or Equipment not approved by Capital Advance Leasing, Inc.

**EQUIPMENT DESCRIPTION(S):** SEE EXHIBIT "A" ATTACHED

**EQUIPMENT LOCATION(S):** Lessee agrees that the Equipment will only be located and used at the following address(s): See EXHIBIT "A" ATTACHED and at no other location unless authorized in writing by LESSOR for the full term hereof and any extensions thereof.

| | |
|---|---|
| INITIAL LEASE TERM: | Thirty-six (36) Months |
| EQUIPMENT COST: | $1,073,675.50 |
| MONTHLY EQUIVALENT RENT: | $34,343.98 |
| RENTAL PAYMENT: | Billed Monthly, plus applicable taxes, payable in advance. |
| ADVANCE RENTALS: | LESSEE agrees to remit a deposit in the amount of $68,687.96, to be applied to the last two Lease Term rental payments. |

If, on the Commencement Date of this Equipment Schedule, there is an increase in the yield of United States Treasury Obligations for a comparable term of the Lease and this Equipment Schedule's assigned base rate, Lessor shall adjust the monthly equivalent rent by applying an adjusted monthly lease rate factor to the Equipment cost. This Equipment Schedule's assigned base rate is 2.15%.

IN WITNESS WHEREOF, the parties hereto by their authorized signatories have executed this schedule at the date set forth below their respective signatures.

LESSEE: Renaissance Healthcare Systems, Inc.

BY: _____

NAME: Michael Smesny

TITLE: Chief Financial Officer

DATE: 3/4/08

LESSOR: Capital Advance Leasing, Inc.

BY: _____

NAME: Christopher Szopa

TITLE: Executive Vice President

DATE: 3/5/08


ORIGINAL

Master Lease Agreement No. 1907
Equipment Schedule No. 002
Page 1 of 2

EXHIBIT "A"
EQUIPMENT DESCRIPTION

Renaissance Healthcare Systems, Inc. (Lessee)

Property (equipment) location: 2709 Hospital Blvd., Grand Prairie, TX 75051

| INVOICE # | QUANTITY | DESCRIPTION |
|---|---|---|
| 2006-56-68 | 3 | BOILERS HOT WATER, BRYAN Model RV350-W-FDGO-LX (S/Ns 95675, 95676, 95677) |
| | 4 | MJ AIR Grilles 29292    FIRE SMOKE DAMPERS 2- 20 X 18  2 - 25 X 25   1 - 24 X 14   1- 26 X 16, 1 - 12 X 12  1- 12 X 6  1- 22 X 10 2- 14 X12, 8 - 12 X 8  2- 24 X 12  1- 48 X 12  1- 28 X 12, 1 - 14 X 10  1- 12 X 10  1- 16X 10  2- 22 X 10, 1 - 72 X48  1- 72 X 36  1- 18 X 10  1- 12X 10, 1- 54 X 12  1- 28 X 10  1- 18 X 16  2-  12 X 12X10  2- 10 X 10 X8, 14- 8 X 6  1- 18 X 16  1- 18 X 16 2- 20 X16, 1- 22 X 12  1- 24 X 12  1- 14 X 14  1- 10 X 10, 4- 10 X 10 X 8  5- 14 X 14 X 12  4- 8 X 8 X 7, 1- 12 X 12  1- 12 X 10  1- 14 X 12  1- 8 X 8 X 6  4- 10 X 10 X 8, 1- 22 X 10  3- 24 X 12 |
| | 91 | MJ AIR Grilles 29291  Slot Diffusers 26 - UPL SDS100  60 inch  4.25W 4 x 10 .125 INLET, 63- UPL  SDS100 48 inch 4.25W  4 X 10 .125 INLET, 2- UPL  SDS100 24 inch 4.25  4 x 10 .125 INLET |
| | 1 | MJ AIR Grilles 29290 CURB ADAPTER 1- 28.5 X 28. 5 X 16 |
| | 33 | MJ AIR Grilles  29293 33- Single Duct volume dampers VAV unit Boxes with Factory Mounted Digital Controls. |
| | 511 | LSI air side control Temperature Control Valves, Chilled & Hot Water Temperature Control Valves |
| 2006-56-69 | 320 | Three hundred twenty (320) DUCT SENSORS MANUFACTURE AUTOMATED LOGIC |
| | 777 | ROUTER, CONTROLLERS, MODULES SENSORS,  MANUFACTURE AUTOMATED LOGIC |
| | 46 | UNITY ENCLOSURES MODEL # SOL24248RC |
| | 6 | UNITY ENCLOSURES MODEL # SOL24368RC & SOL30368RC & SOL30488RC |
| | 1 | FLOW METER MANUFACTURE SOLOE # 1623347-000 SERIAL # 1623347-H001 |
| | 2 | TURBINE INSERTION FLOW METER MANUFACTURE ONICON SERIAL # 155708, 155709 |
| | 27 | PANEL ENCLOSURES  MANUFACTURE GRAYBAR MODEL 2412AL |
| | 14 | AIR FLOW SENSORS  AUDIBLE ALARM  MANUFACTURE TSI S/Ns 19078944, 19080527, 19080545, 19080550, 19083165, 19083221,  19083226, 19083228, 19083229, 19082983, 19083060, 19083070, 19083071, 19083171 |
| | 1 | DIAGRAM DRAWINGS MANUFACTURE AUTOMATED LOGIC |
| | 182 | AUTOMATED LOGIC CONTROL MODULES |
| | 74 | SIEMENS VALVES WITH ACTUATORS PART NUMBER 271-03165 |
| | 468 | RIGID AVERAGING SENSORS MANUFACTURE AUTOMATION COMPONENTS |
| | 329 | MISC. RELAYS, CURRENT SWITCHES, TRANSMITTERS, ENCLOSURES |
| 2006-56-68 | 3 | YORK CENTRIFUGAL CHILLER MODEL # VSD503K-46  SERIAL # GPR-043, GPR-044, GPR-046 |
| | 1 | YORK AIR SIDE AIR HANDLING UNIT AHU-2 MODEL # 6YPHBC32  SERIAL # P06A502610 |
| | 1 | YORK AIR SIDE AIR HANDLING UNIT  AHU-1 MODEL # XTI-045X087-FAJA046A SERIAL # AFSMXTOO71 |
| | | LSI air side control Temperature Control Panels |

Supplied By:   JMC Mechanical, Inc.

Master Lease Agreement No. 1907
Equipment Schedule No. 002
Page 2 of 2

Plus any all related additional softcosts, attachments, modifications, upgrades, replacements and the proceeds thereof as described under the below-referenced LEASE.

| | |
|---|---|
| This Exhibit is hereby verified as correct by the undersigned LESSEE and constitutes all the equipment covered by the referenced LEASE. | This Exhibit is attached to and made part of the Master Lease Agreement No. 1907 dated December 05, 2007 and Equipment Schedule No. 002 and all related documents between LESSEE and LESSOR. |

LESSEE: Renaissance Healthcare Systems, Inc.

BY: _____

NAME: Michael Smesny

TITLE: Chief Financial Officer

DATE: 3/4/08

LESSOR: Capital Advance Leasing, inc.

BY: _____

NAME: Christopher Szopa

TITLE: Executive Vice President

DATE: 3/5/08

**ORIGINAL**

Master Lease Agreement No.  <u>1907</u>
Equipment Schedule No.       <u>002</u>

**EXHIBIT "B"**
**STIPULATED LOSS VALUE**

| NUMBER OF RENTS RECEIVED | PERCENTAGE OF EQUIPMENT COST | NUMBER OF RENTS RECEIVED | PERCENTAGE OF EQUIPMENT COST |
|---|---|---|---|
| 1 | 103.00% | 19 | 54.13% |
| 2 | 99.80% | 20 | 51.28% |
| 3 | 97.25% | 21 | 48.42% |
| 4 | 94.69% | 22 | 45.54% |
| 5 | 92.10% | 23 | 42.64% |
| 6 | 89.50% | 24 | 39.72% |
| 7 | 86.89% | 25 | 36.78% |
| 8 | 84.25% | 26 | 33.82% |
| 9 | 81.60% | 27 | 30.84% |
| 10 | 78.93% | 28 | 27.85% |
| 11 | 76.25% | 29 | 24.83% |
| 12 | 73.54% | 30 | 21.80% |
| 13 | 70.82% | 31 | 18.74% |
| 14 | 68.09% | 32 | 15.67% |
| 15 | 65.33% | 33 | 12.58% |
| 16 | 62.56% | 34 | 9.46% |
| 17 | 59.77% | 35 | 6.33% |
| 18 | 56.96% | 36 | 3.17% |

LESSEE: Renaissance Healthcare Systems, Inc.

BY: _____

NAME:  Michael Smeshy

TITLE:  Chief Financial Officer

LESSOR: Capital Advance Leasing, Inc.

BY: _____

NAME: Christopher Szopa

TITLE:  Executive Vice President

👉 **ORIGINAL**